FINLAY *v.* FINLAY BROTHERS & WAYMOUTH TRADING CO.

APPEAL from the District Court of San Juan.

No. 66.—Decided May 4, 1905.

LEASE—PARTNERSHIP.—The contract of lease is a bilateral and consensual contract whereby one person binds himself to give to another the use of a thing for a definite or indefinite period and for a specific price; which contract cannot be confused with a contract establishing a partnership, because in the latter two or more persons bind themselves to contribute in common, property, money, or services with the intention of dividing the profits among themselves.

ID.—PERSONALITY OF PARTNERSHIP.—It is an indispensable requisite in every partnership constituted by virtue of a contract that the entity of the partnership itself should exist, and this is entirely independent and distinct from the partners themselves and is necessary in order that the law may recognize the personality thereof as such partnership.

CONTRACT—INTERPRETATION.—Where the terms of a contract are clear and explicit and leave no doubt as to the intention of the contracting parties, the clauses thereof will be literally construed one with another and giving to the doubtful clauses the meaning which clearly appears from all of them and the intention of the contracting parties must always be made to prevail.

ID.—CONTRACT OF LEASE FOR A DEFINITE PERIOD.—Where a contract of lease is executed for a term of ten years and the lessee agrees to pay during that period a mortgage credit encumbering the property leased, the fact that it might have been stipulated in the contract that if it is impossible to make such payment during the said term by reason of unforseen circumstances, the contract will be deemed to be extended for the time necessary in order to pay the amount remaining unsatisfied, the term of the lease so fixed will not be deemed to have been changed, nor can it be maintained that the term is indefinite.

ID.—NULLITY OF CONTRACT OF LEASE—LEGAL TERM.—Failure to fix the term of duration of contracts of lease is not sufficient ground upon which to base a declaration of nullity thereof according to the provisions of sections 1480 and 1484 of the Civil Code, which fix the legal term of duration of such contracts in the absence of a specific agreement in that respect.

ID.—SPECIFIC PRICE.—The indefinite or uncertain condition with respect to the price must not be confused with a failure to express the same numerically, because a specific price may be stipulated in a contract which is not susceptible of being expressed numerically, but by certain liquidations subject to fluctuation.

ID.—AGENT—COMMISSION—INTENTION OF PRINCIPAL.—In order to determine the validity and efficiency of contracts executed by agents, recourse must be had in the first place to the literal terms of the commission in order to determine the limitations of the powers of the former; it being eminently proper and absolutely necessary to invoke the evident intention of the principal when the words of the deed appear to be contrary thereto.

ID.—PRIVATE INSTRUCTIONS—THIRD PERSON.—Where agents act by virtue of private instructions from their principals the effect of such instructions are binding only upon principal and agent and cannot affect a third person nor cause him any damage or loss whatever.

ID.—CONTRACT EXECUTED BY AGENT—LIMITED POWER—RATIFICATION BY PRINCIPAL.—An agreement entered into by an agent binds his principal, it being immaterial in a judicial proceeding whether he has or has not exceeded his authority when in the power of attorney no limitation has been placed upon the agent or when the principal having knowledge of the contract shall have deemed it to be valid, availing himself of conditions therein established which are favorable to him.

ID.—PUBLIC INSTRUMENT.—Where a contract of lease is executed in favor of a partnership and one of its directors has appeared at the execution thereof as the representative of such partnership, showing his credentials and his authority to use the signature of the firm, it is of no importance for the validity of the instrument that such director shall have signed the same in his own name and not with the firm name, especially where far from repudiating such instrument the firm, on the contrary, maintains that it is valid.

ID.—CONSIDERATION—RECIPROCAL OBLIGATIONS OF THE PARTIES.—Where by virtue of a contract of lease of a rural estate the lessor and the lessee shall have contracted reciprocal obligations, and where it is stated that one of the reasons for the execution of the instrument is to satisfy the debts encumbering the estate and the impossibility of the lessor to attend to the business personally, it cannot be maintained that such contract is without a consideration or that the consideration is illegal, fraudulent or false.

ID.—Where the stipulations of a contract do not clearly show what the consideration was, it will be presumed that a consideration exists, as also that it is legal so long as the contrary be not proven.

ID.—EFFECTS OF ENTRY OF NOTICE OF AN ACTION FOR DIVORCE—FRAUDULENT CONTRACTS.—Where notice of an action for divorce has been entered in the registry against the property of the defendant, all the acts of the latter with respect to such property must be subordinate to the consequences of the judgment rendered in such action; and therefore it is impossible to presume for the purposes of declaring the same fraudulent that a contract of lease executed by such defendant was for the purpose of eluding the effects of a liquidation of the ganancial property, either because this could not be obtained by the execution of a contract without a consideration or with an

illegal consideration, or because such an entry would not prevent the defendant from performing acts of ownership upon and with respect to such property.

ID.—In order to annul the effects of a contract contained in a public instrument executed under all the formalities and requirements of the law, it is not sufficient to make mere conjectures which are insufficient to convince the mind that there was a simulation and prove that the consideration therein mentioned was false, or null and void.

ID.—TESTAMENT.—The statements contained in a testament, which is a unilateral instrument, can only prejudice the testator or his heirs according to the principles governing the probatory value of public instruments, and therefore the statements made by one person in his testament cannot be invoked to disprove statements made years later by the same person in a contract executed by public instrument.

COSTS.—Costs must be imposed upon the party whose demands have been in all things denied.

## STATEMENT OF THE CASE.

This is a civil declaratory action brought in the District Court of San Juan, for the annulment of a contract of lease of the estate "Carmen," the lands appurtenant thereto and a cattle business, the cancellation of records and other orders, by Josefina Finlay de Fabián, married, of age, a landowner and resident of this city, represented and defended in this Supreme Court by Attorney Eduardo Acuña Aybar, as plaintiff, against Finlay Brothers and Waymouth Trading Company, a commercial firm of this city, represented by Attorney Jacinto Texidor. The case is pending before us by virtue of an appeal taken by the plaintiff from the judgment rendered by the said district court, which reads as follows:

"*Judgment.*—In the city of San Juan, Porto Rico, June 2, 1904.— An oral and public hearing was had in this declaratory action for the annulment of a contract of lease, the cancellation of records and other orders by the court. The action was brought by Josefina Finlay de Fabián, married, of age, a landowner and resident of this city, represented by Attorney Eduardo Acuña Aybar, as plaintiff, against the commercial firm of Finlay Brothers and Waymouth Trading Company, represented by Attorney Jacinto Texidor, as defendant.

"1. Josefina Finlay de Fabián brought an action against Finlay Brothers and Waymouth Trading Company, attaching to her complaint a certified copy of the record of the unsuccessful proceedings to

effect a conciliation, and praying for the annulment of the contract of lease, dated October 24, 1902, relating to the 'Carmen' estate, the lands appurtenant thereto and a cattle business, entered into between George I. Finlay and said company, the cancellation upon the registry of property of the records mentioned in the body of the petition, or a declaration of the limitation of the annulment and its effects to the co-ownership of the plaintiff, with costs against the defendant.

"2. The plaintiff stated the following facts: The instrument executed before Notary Mauricio Guerra, on the date mentioned above, by John F. Finlay on behalf of his brother, George, and Rafael Ojeda on behalf of the defendant company, stated that the reason for the contract was the state of the health of George and the evident necessity for the greatest care in the administration of the estate, owing to the great liabilities to which it was subject, and which was the ground for the lease of the estate for the time and under the terms therein set forth, John being given instructions so to lease it. The instrument describes the estate, the subject of the contract and the decision, to make an inventory of the stock and plantings for the purposes of return at the proper time. It was also stated that the payment to Charles P. Armstrong and others was one of the grounds of the contract, and that the lessee was to pay the principal and interest, amounting to 214,110 *pesos,* in installments, the first one falling due on March 12, 1900, and the last on September 2, 1911; the price of the lease was to be the amount of the annual installments and the interest agreed on, and, in addition, a payment to George Finlay or his heirs, during the term of the contract, as part of the lease price of 25 cents for every quintal of sugar of the second class manufactured, and 10 cents for every quintal of mollasses, and in addition, 50 per cent of the net proceeds of the distillery, the lease price being that stated. The lease included the cattle business that George had in the estate, it being agreed that the lessee company should be paid as the price of such lease one-half the net proceeds in each year, the accounting to be conducted in the manner established in the respective clause. The term of the lease was ten years, the time necessary for the payment of the credit mentioned, and in the event of such payment not being made within the term agreed on, for reasons which could not be foreseen at the time, but which might arise and be beyond the control of the lessee, the term should be extended the time necessary, provided the creditor agreed thereto, and the time being fixed for the payment of the balance due, which would be mutually agreed on by the creditor and the lessee company, and if

it suited the latter to continue the contract for the time necessary granted by the creditor, which extension was to conform to the other conditions of the instrument; and in the event that any fortuitous circumstances should arise which would prevent the operation of the property as it was being operated at the time, without extra expense, the lessee company would have the right to demand the recision of the contract. John Finlay represented his brother George, under a power of attorney dated June 3, 1887, containing a clause granting full power to the lease, but the provisions of the power of attorney granting the representation are not inserted, it being stated 'in accordance with the instructions which the principal would give separately,' the representation of Rafael Ojeda being established in view of the articles of association executed on May 23, 1901, of which company George and John Finlay, Thomas George Waymouth, Albert Lee, were members and managers having the right to sign the firm name, and the principal Ojeda using his personal signature in executing the lease. This lease was recorded in the registry of property, and as the wife of George had not taken part in the execution thereof, as was required by the law at the time, the record thereof was suspended until the legislative assembly gave force to the contracts executed without the attendance of the spouse. On March 25, 1902, Emilia F. Francisca Van Rhyn brought a suit for divorce against George Finlay, the petitioner, including a prayer for the liquidation of the property of the conjugal partnership, and for measures to protect her rights, for which reason she requested that a notice of her suit be entered in the registry of property. This was done against the 'Carmen' estate and its appurtenances, the record being cancelled by a compromise on January 29, 1903. Under this compromise, Emilia and her daughters, the heirs of George Finlay, since deceased, made an agreement with regard to the community property and the rights of the former to the estate. George became quite ill in July, 1902, leaving for New York on the 15th, and returning about the middle of August, then going to New York again on September 10th, thence to Europe, returning to New York and arriving in San Juan on November 28th, dying December 26th of the same year. By his will he appointed as his heirs, his daughters, of whom three alone were living, leaving them the 'Carmen' estate with all its contents, and providing that this estate should be managed so as to produce the greatest profit possible in order that the debts which he left at the time of his death should be paid punctually and that the estate should be freed from the encumbrances thereon as soon

as possible, and authorizing the payment of a sum not exceeding $300 per month to each of his daughters for expenses; that neither the property nor any share in the estate should be sold until all debts had been paid; and providing furthermore that the 'Carmen' estate should be worked for the absolute benefit of his daughters and heirs, and that the income alone should be used by them, new mortgages or obligations being forbidden, and John Findlay being appointed executor and trustee in the first place. On April 2, 1903, the partition of the property of George Finlay took place among Emilia, Micaela and Josephina Finlay, the record showing the share of each to be 132,750.20 *pesos*, the share including for the payment of one-third of the mortgage on Carmen y Monserrate, in favor of Armstrong, the sum of 54,900 *pesos*, there being adjudicated to each, among other property, a one-third interest in the 'Carmen de la Monserrate' estate and other lands, *pro indiviso;* it belonging therefore in common and in equal parts to the three daughters who inherited the property of the testator, the estate in question being that which was the subject of the contract of lease referred to. Josephina stated in the partition proceedings that her agreement was without prejudice to her rights against the lease of the 'Carmen' estate, and she does not accept the statement made in said contract by the attorney in fact of her father, that it had been executed in accordance with the instructions he had given him to execute it under the conditions therein set forth; that she has not been able to secure in a friendly manner the annulmemnt of the contract, and as the 'Carmen' estate and its appurtenances, with 500 *cuerdas* of land planted in first-crop cane and 1,100 *cuerdas* in rattoons, 840,000 quintals of sugar-cane, or 630,000 quintals of sugar of the second grade, and 8,400 of the third grade, the first valued at 3.30 *pesos* and the second at 2.50 *pesos* would give a gross revenue of 228,900 *pesos*, and deducting an expense of 144,400 *pesos*, leaving a net profit of 84,500 *pesos;* and taking as an example the year 1904, the lease would pay on the debt 280,000.84 *pesos* on the amount per quintal to the co-owners, 166,030, leaving a net profit to the lessee company of 40,786; and the last year of the lease, that is to say, from September 2, 1911, to October 24, 1912, the mortgage credit would be extinguished and the lease would terminate with a profit of 70,000 pesos, more or less, for the lessee.

"3. The legal propositions alleged are that contracts of commercial companies must be subscribed with the firm name in order to make them valid; that no consideration is stated in the contract, and that

the price and term thereof are indefinite; that George could not give instructions for a contract which limits the ownership for an indefinite number of years, and even though given, it would not be valid by reason of the lack of capacity on the part of the parties executing the same, and because of the entry of notice of the pending actions (in the registry of property); sections 405, 1446, 1569 and 1621 of the Civil Code are cited, and frivolity (temeridad) is alleged for the purpose of the imposition of costs.

"4. In their answer Finlay Brothers and Waymouth Trading Company requested the dismissal of the complaint and a declaration of the validity and efficiency of the contract and instrument of lease, and the dissolution of the partial annulment and cancellation of records, with the costs against the plaintiff.

"5. The petition is based on the following: The contract of lease, to which were parties George Finlay, represented by his brother John, and the defendant company, represented by one of its directors, Rafael Ojeda, the former acting under a power of attorney granted him by George on June 3, 1887, with the power, among others, to sell and lease his property, the motive for the execution of the instrument not being the illness of George, but to prevent the estate from falling into unskilled hands and thus delaying the payments upon the mortgage debt; and desiring to prevent this and the entry of the notice of the action for divorce not producing the effect of preventing the exercise of the rights which Finlay had as an owner, the contract is legal in so far as the capacity of the latter to execute it is concerned; that the contract included the cattle business under the condition that an inventory of the number of head should be taken, in order to return at the proper time the same number, of the same class and condition as those leased, ten years being fixed as a specific and determinate term, such period being fixed because it was estimated that the mortgage debt would be paid by that time, and as said debt is the most important motive for the execution the contract and the amounts credited thereto form the most essential part of the lease price, the term during which it is thought the debt will be settled is fixed; and if it should be settled before the expiration of such term, then the contract will have terminated under the fourteenth clause. Provision is made that, in the event of any difficulty arising which would prevent the payment of the installments of the mortgage debt, an extension shall be granted, thus showing that the most important consideration of the contract is the payment of the credit, although such extension does not leave

it to the discretion of the contracting parties to fix a new term nor to be bound to the exact time for the payment of the debt. The existence of a fixed price is alleged; that it is the payment of the installments of the mortgage debt and the percentage referred to in the complaint for the co-owners which may be greater or less; that the representation of John Finlay is established by the insertion of the first clause of the power of attorney granting the right to sell, lease or mortgage the property of the principal, it not being necessary to set forth the instructions, the right of Rafael Ojeda to appear on behalf of Finlay Brothers and Waymouth Trading Company, which entered on the execution of the contract, being also established; it being true that the instrument of lease was taken to the registry of property and that the record referred to was made. Said record reads as follows: 'Owing to the non-participation of the wife of George Finlay in the execution of the instrument of lease, as required by law, etc.' But the Legislative Assembly has given force and effect to this contract, among others, and it no longer has such a defect, and if it did exist, it is not the plaintiff but Emilia Van Rhyn who could supply it. The answer further states that the lease in question was executed in accordance with the laws in force at the time of its execution, which was the former Civil Code, and this contract of October 24, 1902, was recorded in the registry of property according to a note appearing at the foot of the copy; that in the execution of the contract lease John Finlay confined himself to the instructions which had been given him for the purpose by his brother and principal, George, at the various conferences he had had with him in that connection, and that while George was in New York he was informed of the contract and absolutely approved what had been done by his attorney in fact, and so informed the latter and other persons; that it is true that Emilia Van Rhyn brought an action for divorce against George and that the record of the suit was canceled in the registry of property. She executed an instrument on January 29, 1903, discontinuing the divorce proceedings and the incidental issues, and conveying to Josephina, Emilia and Inez Finlay her rights to the property she contributed at the time of her marriage to George, and the acquets and gains, the assignor receiving $10,000, in addition to the ownership of a number of estates and a life annuity. It was further alleged that the testament of Finlay reveals an earnest desire that the 'Carmen' estate should not be lost through unskilful management and that his credit and name should be maintained at the height they had always been, his testa-

.ment providing that after all the debts to which his property was subject had been paid, then and never before could the total amount of the profits of the estate be divided among his aforementioned daughters and their legitimate children, and for this reason he thought of a form of lease calculated to obviate the prosecution of any action against the acts of Finlay and against the dispositions of his testament; it provides that the estate is to be worked for the absolute benefit of his daughters and heirs, and prohibits the placing of any new mortgage or obligation thereon, which prohibition being imposed upon his heirs can refer only to mortgages or obligations after the death of George Finlay; and as to the estate being worked for the absolute benefit of the daughters and their heirs, the testator, wishing that his estate be managed as well as possible, provides and fixes the manner in which the proceeds from his estate shall be applied, the amount of the income to be given his daughters, etc.; that is to say, that the executors could have managed the estate to pay the debts, deliver the income to the heirs, repair and improve the estate, and as the estate had been managed long before the lease by the defendant company the contract thought out by Finlay after careful consideration as to all details and instructions to his attorney in fact and brother, was executed, and, after having been expressly ratified by him, it is now respected by two of his heirs and cannot be attacked as onerous and prejudicial by only one of his said heirs, as an estate is involved, which is subject to an incumbrance amounting in principal and interst to $214,110; that it is necessary to pay an average of 237,090 *pesos* per year, which sum must be paid by the lessee company, and if it were under the administration of the heirs they would be required to make such payment, and in order to make the estate productive it would be necessary to provide funds for cultivation and grinding, making an additional annual expense of 150,000 *pesos,* which sum the heirs could not command, and they would be forced to raise funds at a great sacrifice or by creating a new obligation, which is prohibited by the testator. Now, under the contract, the lessee company accepts the fluctuations of the market, the risks of the business, assures the payment of the mortgage debt, delivers the monthly rental and in due time returns the estate free from encumbrances, while if administered by the heirs disagreements would arise, as is the case with reference to this contract, and such disagrments would lead to the ruination of the estate or to its delivery to the mortgage creditors in payment of their claims. It is true that there are three heirs and that the division

and adjudication of the property set forth is substantially correct; the statement made in the ninth allegation of the complaint is correct, but the instrument of partition does not speak of the lease of the 'Carmen' estate, although in said statement the plaintiff denies that she has made any proposition whatever that the lessee company should accept the administration of the estate for such time as it might be necessary in order to free the estate from the debt to which it was subject; she denies the ingenious accounts, as she styles them, of alleged profits, and the products the plaintiff claims establish the average to be paid Armstrong, taking as a basis the product of 1902, the average price of sugar, the expenses to be deducted, the profit on the sugar being fixed at 40,442.82 *pesos,* which, added to the other profits enumerated, give a total profit of 52,698.82 *pesos,* and after making the deductions mentioned the lessee is left a profit of 13,700 *pesos,* more or less, acccording to the accounts of receipts and expenditures; that the principle laid down by the plaintiff is erroneous and false, as are the consequences deduced in these premises, because it is considered that the sugar cane is bought of the growers. The crop of 1903 is described, it being alleged that the amount of sugar cane produced on the estate amounted to 363,533 quintals and 35 pounds, while that bought on shares of the growers amounted to 288,846 quintals and 45 pounds, making a total of 652,379 quintals and 80 pounds of sugar-cane. This gives an erroneous difference between the product alleged by the other side and the exact data of the administration; the production in sugar was 57,627 quintals and 50 pounds of the second grade and 6,245 quintals and 20 pounds of the third grade, this sum being fixed and exact, while the calculation of the plaintiff is incorrect. It is denied that Rafael Ojeda was an employee, as he had been the manager since May 5, 1894, of the Successors of Finlay & Brothers, and upon the defendant company being established on May 23, 1901, became one of the stockholders and is now one of its directors. The other statements in the complaint, in so far as they may prejudice the defendant, are denied. The conclusions of law are that the contract specifies a fixed term and a certain price, that it contains all essential requisites to make it valid, the articles cited being articles 50, 51, 118, 134 and 155 of the Code of Commerce; 1221 to 1225, 1245, 1246, 1248 to 1250, 1252, 1267, 1276, 1278, 1446, 1567 and 1627 of the Civil Code; the decisions of the Supreme Court of December 1, 1886; May 11, 1888; July 4, 1893, and November

13, 1895; the Act of the Legislative Assembly of February 24, 1903,. and section 63 of General Order No. 118, series of 1899.

"6. The documentary evidence presented by the plaintiff in-cludes the instrument of partition of the property of George Finlay executed by his heirs, which shows that said George Finlay died' on December 24, 1902; a certified copy issued by Notary Gabriel. Guerra of the closed will of George Finlay executed on April 11,. 1896; the order of this court admitting it to probate, the record' of the probate thereof of January 19, 1903. The plaintiff also prayed. the court to have made part of the record, and that they be secured by means of the proper mandatory orders, a certified copy of the instrument of lease of the 'Carmen' estate, the power of attorney executed by George Finlay in favor of his brother John, a certified copy of the record of the protocolization of the general inventory of the 'Carmen' estate made on November 10, 1902, by Notary Guerra, and a certified copy of that portion of the inventory included under the heading of 'Sugar cane for grinding on the estate 'Carmen'' in the crop of 1902-1903,' which particulars, according to a petition of September 14, 1903, counsel for the plaintiff, in order to avoid' duplication, believes it unnecessary to introduce as evidence, by rea-son of the fact that they have been presented by the other side, but reserving the right to seek their introduction in the event of their being withdrawn, and as he acknowledges said documents their com-parison is unnecessary, and their contents will be set forth in the nar-ration of the evidence presented by the defendants.

"7. The evidence presented by the plaintiff includes, in addition to a certificate issued by the Registrar of Property of San Juan, to the effect that there appears in the day book a record numbered 354 of the presentation on December 1, 1902, of the instrument of lease the subject of the procedings, and in the margin opposite the same a note of the withdrawal of the document owing to the in-scription at that time not being desired, such note bearing the date of January 7, 1903, a record numbered 605 of the presentation of said instrument of lease on February 9, 1903, and in the margin a' note of the withdrawal thereof on March 5th, and another note to the effect that 'the record of the document referred to in the adjoining note has been made with regard to the property therein mentioned, excepting that to which the preceding note refers, the rec-ord of which has been withdrawn;' this note bears the date of March 6, 1900, and is followed by the record of the lease of the 'Car-men' estate to the defendant company on March 6, 1903. Opposite

this last record appears an entry which reads: 'The other estates recorded of those comprised in the document the subject of the opposite record, have been recorded in the place indicated in the note upon the margin opposite the record;' then follows a literal copy of the part of the lease in question relating to the 'Monserrate' plantation, dated March 6th of the said year, of that of the land situated in the *barrio* of Candelaria, in Vega Alta, other lands situated in the *barrio* of Candelaria, in Vega Alta, land situated in the *barrio* of Cabo Caribe in Vega Baja, and still other land in the *barrio* of Candelaria, in Vega Alta, all of these records pertaining to the lease in question; a certificate issued by the secretary of this court relating to the action for divorce brought by Emilia Van Rhyn against her husband, George Finlay, the decree admitting the complaint, the order directing its prosecution, and the order granting the petition for an entry of notice of the suit, a copy of the order to the Registrar of Property and of the entry made by the registrar under such order.

"8. The plaintiff furthermore presented two certificates signed by the representatives of the 'Red D Line' and 'The New York and Porto Rico Steamship Company,' setting forth that George Finlay had sailed and arrived on the vessels of said company on the days, months and years therein stated, which statements were agreed to by the other side. Two directors of the defendant company testified, one of them stating that Francisco de P. Acuña had sent several letters, the contents of which he does not remember, in the name of Josephine Finlay; that they dealt with Mr. Waymouth; that he knows that the recission of the lease agreement with the company was discussed, and that the latter should continue to manage the 'Carmen' estate with a commission, but that he cannot state the agreement reached; that he orderd the inventory made which is of record and which was shown him; that it was made on the estate, and that he took no personal part in its preparation. The other director said that Josephine Finlay had never made any proposition for an arrangement through Mr. Acuña, but only a proposition for a settlement of accounts, and not to the firm but to the executors; that he had not had any conferences with respect to the rescission of the lease as partner of the defendants, but he had such conferences as the husband of one of the heirs, proposing in such capacity to purchase the stock held by Josephine; that these conferences took place four months ago; that in March, 1903, conferences were held with Mr. Acuña, but that the latter did not propose that

the 'Carmen' estate should remain under administration until Armstrong's debt should have been settled; that these propositions were made by the deponent to Fabián before his departure for Europe and were not accepted by the latter; that he does not remember whether he made any statements with regard to the lease, as this was a point which was not discussed very much; that he does not know the amount of the profits of George Finlay from the 'Carmen' estate in 1901, but that he knows they were above normal, by reason of the sugar having arrived in the United States after the import duties thereon had been raised, and it is possible that he so stated to Josephine; that the inventory of the 'Carmen' estate and its appurtenances was made by the superintendent of the estate, with experts for the appraisal of the cattle, machinery, etc., such appraisals being included in the inventory; that there was a difference between the amount stated in the inventory and the actual amount of sugar cane planted of 190 *cuerdas,* which had been improperly included in the inventory, the fact being that such sugar cane belonged to two planters on shares, as established by letters of the manager of a date subsequent to the inventory; the new plantings did not amount to much, being 200 or 250 *cuerdas,* the remainder being old cane at the time of the making of the inventory; that he does not know the weight of the cattle, the number of head and value only being stated; upon being shown the letter of November 7th addressed to the deponent by George Finlay he recognized it to be authentic and referred to another containing a statement of the lease of the 'Carmen' estate as made.

"9. Francisco de P. Acuña, a witness, testified that as the attorney in fact of his principal, he had had three conferences in March, 1903, with the defendants, for the purpose of avoiding these proceedings seeking the annulment of the lease, and that the estate should be placed in the hands of an administrator on a commission basis, the heirs to divide the profits among themselves. This proposition was not accepted by the defendants, who had conferences with Finlay and Waymouth as partners and not as heirs, and after the institution of the proceedings new propositions were made to counsel for the defendants, who replied that there were other directors besides those mentioned; but each director has the power to make settlements; that the estate is subject to a mortgage of about 200,000 *pesos* in favor of Armstrong, and that the latter accepted a stipulation under which the defendants became jointly liable for the mortgage.

"10. The experts testified that the estimated production of a

plantation and appurtenant lands having 500 *cuerdas* of first-crop cane and 1,110 of rattoons might reach 840,000 quintals of second grade sugar and 8,400 quintals of third grade, placing a value of 3.30 *pesos* per quintal on the former, and 2.50 *pesos* on the latter, . giving a gross revenue of 22,800 *pesos,* and deducting therefrom 14,400 *pesos* for all expenses, including taxes, the net income from the estate might be fixed at 84,500 *pesos;* but 1,766 *cuerdas* of sugar cane should have produced 935,246 quintals and 45 pounds, estimating that growing from rattoons at 400 quintals per *cuerda,* and that from first-crop cane at 800 quintals, and the 400 planted on shares at the amount appearing in the account at folio 158 over. In reply to the question of the defendant, the experts answered that it is not possible to fix in advance the production of a sugar plantation such as the 'Carmen' estate for every year and during a period of ten years; that if data were furnished it would be possible to fix the number of *cuerdas* of newly planted sugar cane and of old cane for every year during a period of ten years; that it is true that on the 'Carmen' plantation and on other plantations the exact number of *cuerdas* of sugar cane planted is not ground every year, this depending on the convenience of the owner and the kind of planting on the estate; and replying to the question whether it were true that the production of sugar varied according to the cultivation, time, and other conditions, and depended not only on the number of quintals of sugar cane, but on the class and condition thereof, one of the experts, replied that this was true; the second stated that he could not answer because he was not acquainted with the 'Carmen' estate, and the third replied that this was not so, because the lands of the estate give 390 quintals per *cuerda* and those of the growers 722; 11 quintals per *cuerda,* and that he bases his calculation on the 250 *cuerdas* of new planting of the 'Carmen' estate and the 1,116 of rattoons together.

"11. The evidence presented by the defendants includes the instrument of lease, the subject of these proceedings, executed on October 24, 1902, and recorded in the registry of property on March 6, 1903; the first copy of the notarial act of the registration of the inventory, and a copy of said general inventory of the 'Carmen' estate made on November 10, 1902, and signed by John Finlay and Rafael Ojeda, the latter as one of the directors of the defendant company. This document sets forth that it was agreed in the instrument of lease to make the inventory, and that it having been made it was agreed to protocol it, delivering it for this purpose to the

notary, who made it a part of his protocol, and adding after his rubric that it appeared to be authorized by the said Finlay and Ojeda. The evidence also includes a copy of the power of attorney granted by George I. Finlay to his brother, John F. Finlay, on June 3, 1887, which copy shows that the power of attorney is conferred upon him in order that he may in the principal's name and on his behalf exercise the powers therein granted, in accordance with the instructions which were to be communicated to him separately in the manner set forth in the clauses therein contained, being to sell, lease, or mortgage his real or personal property, executing and accepting the respective instruments necessary in such transactions. This document and the other two mentioned in this paragraph also form part of the evidence of the plaintiff, as stated in the finding relating thereto.

"12. The defendants also present as evidence an instrument of compromise and assignment of actions and rights, executed on January 29, 1903, by Emilia Van Rhyn, in favor of the heirs of George I. Finlay, being Emilia, Inez and Josephine, including all actions and rights to which she is entitled or to which she may become entitled, or to which she may become entitled by reason of the sum brought in marriage, or the gains of the conjugal partnership, and the abandonment of the divorce suit and the issues incidental thereto, binding herself to discontinue the same; a copy of the articles of partnership (Successors of Finlay Brothers), executed on May 7, 1894, by George and John Finlay and Rafael Ojeda, the capital of the company being 30,000 *pesos*, contributed by the first two named, who are special partners, the managing partner, Rafael Ojeda having the use of the firm name; a copy of the instrument by which said partnership was dissolved, dated May 28, 1901, the new firm created of 'Finlay Brothers and Waymouth Trading Company' assuming charge of its liquidation.

"13. Further evidence presented by the defendants consisted of the following private documents: A statement relating to the 'Carmen' estate, signed by the superintendent, Manuel García Marrero, corresponding to the week of May 31 to June 6, 1903; another statement for the week of July 19 to July 25, 1903; and a general account of sugar cane of said estate, crop of 1903, signed on June 9th by said superintendent; a letter dated in New York, November 7, 1902, written in English, signed by George I. Finlay, addressed to Mr. Waymouth; another letter dated in New York, November 7, 1902, received by Hilario Cuevillas; another from New York, signed

by Charles P. Armstrong, Roland D. Armstrong and William F. Armstrong, dated November 12, 1902, addressed to Finlay Bros. & Waymouth Trading Company, with an acknowledgment of the parties signing it as to the contents of the letter and the genuineness of their signature, the letter stating that they held a mortgage on the 'Carmen' estate, payable in ten years, and that the first payment had been made in September, 1903; all of these statements appearing in the reply to the letters rogatory sent to New York.

"14. The defendants likewise presented as evidence ledger No. 4, of George I. Finlay, to show the account of the 'crop of 1902,' and upon its presentation it was copied, the items giving a total of 163,106.49 *pesos;* passing to the profit and loss account there appears a profit on the crop of 52,698.82 *pesos,* which, added to the former, gives a total of 215,815.31 *pesos;* folio 244 of this book shows for the sale of sugar at an average of 308,184,541.19 *pesos;* for the sale of rum, 5,926 gallons, 17,603.43 *pesos;* for molasses, 1,978.50 *pesos;* profit on oxen, 3,954.20 *pesos;* on breeding cattle, 1,863.50 *pesos;* on horses, 185 *pesos;* for cart horses, 3,893.24 *pesos;* total, 215,479.06 *pesos;* which, with 326 *pesos* and 20.25 *pesos,* for balance and to (balance) makes the accounts correct.

"15. Hilario Cuevillas, a witness for the defendants, being absent in Barcelona, in reply to letters rogatory, he testified that he was a close friend of and the attorney for George Finlay; that George Finlay, being desirous of leaving for Europe, was seeking some means of discontinuing his business, and to this end he was also negotiating to leave in other hands the 'Carmen' estate; that to accomplish this he thought of the establishment of a company, of which he would be a shareholder, and also other means in the event of his not being able to establish such company; that the heaviest burden of the 'Carmen' estate is the mortgage held by Armstrong for $21,400; that, although he cannot affirm it positively, he believes that he tried to · lease the 'Carmen' estate to the defendant company in view of what occurred after the execution of the instrument of lease. With respect to the cattle business, the matter appears natural to me, because it was connected with the business of the estate; he knew of the execution of the instrument of lease, because he had participated in the rough draft thereof; that it is true that he had written to George Finlay that he received the copy which was read to him, although he cannot state positively that it is an absolutely correct copy, but he remembers that he thanked him for his participation in drawing the instrument, which led him to believe that Finlay was

acquainted with all of the terms of the same; that he expressed satisfaction at the execution of the instrument, not feeling any anxiety as to his interests; and upon being cross-questioned he stated; that he was counsel for George in the divorce proceedings brought by his wife, which matter was settled out of court, and that it appears to him to be true that a notice of the complaint was recorded; he was consulted by Saldaña and Waymouth with regard to the instrument of lease; that he took part as counsel in the testamentary settlement, and that when the witness left, the fact that the complaint had been filed was publicly known and that he had heard of it from a number of persons, including Waymouth himself, and Saldaña, but that he was not acquainted with the terms thereof, nor did he give any instructions or recommend lawyers, merely informing Finlay and Waymouth that he left most of his business with Texidor by agreement of the parties.

"16. In addition to this witness two other witnesses testified for the defendant at the oral trial, to the effect that he had been worried over the administration of the 'Carmen' estate because of a mortgage thereon amounting to 200,000*pesos;* that in this connection he stated to one of the witnesses that he desired to lease it to the defendant company; and the other witness testified that Finlay had spoken to him of the lease, signifying that he was agreeable thereto, the witness producing the letter in which such agreement was expressed; and further testifying that the divorce did not worry Finlay so far as the question of property was concerned, although it did wound his dignity; another witness, Manuel García Marrero, acknowledged the documents signed by him. The handwriting experts testified, ratifying the opinion presented by them, declaring the signatures of George I. Finlay to be genuine, as they appeared in the record with reference to the letters addressed by him from New York to Hilario Cuevillas and to Mr. Waymouth, after having compared the same with the undoubtedly genuine signatures of George Finlay which appeared in the protocol of Notary Gabriel Guerra, and upon the holographic testament which he made on Aprill 11, 1896, and before Mauricio Guerra on January 19, 1903.

"17. After all the evidence had been heard, counsel for the parties made their respective arguments.

"Presiding Judge Juan Marrera Martínez prepared the opinion of the court.

"1. A lease is a bilateral concensual contract in which one party undertakes to give to the other the use of a thing for a definite or

indefinite period (according to articles 1480 and 1484 of the Civil Code) in consideration of a price certain, a contract which it is impossible to confuse with a partnership agreement, because in the latter two or more persons undertake to contribute to a common fund money, property, or industry, with the intention of dividing the profits among themselves; which elements are lacking in the contract under discussion, there being also lacking the new entity or that independent of the partners which must be present in every partnership constituted in a contract in order that the law may recognize that personality according to the provisions of the second title, first book of the Civil Code, and especially articles 33 to 37 of the same.

"2. There is not that confusion between the contract of lease and a partnership contract, alleged by the plaintiff, when we consider clauses 6 to 14 of the contract contested, as such clauses cannot be included in nor form part of a partnership agreement in view of the provisions of articles 1583, 1588, 1589, 1593, and several others of the Civil Code, because such clauses of the contract in question refer to points which are proper in lease contracts exclusively, such as the rights, duties and obligations of the lessee, who, under said clauses, must maintain the estate and operate it, is given the power to sublease it, assumes the obligation of returning the estate at the end of the term of the lease in the same state in which he received it, and to see that the contracts with the growers on shares are fulfilled, that the taxes are paid, with the right to recover for the improvements existing at the time of the termination of the contract, and that all repairs to machinery and buildings should be defrayed by the lessor exclusively and deducted from the amount due him as the price of the lease. This construction of the contract is further borne out by the agreement that the lessee shall have the right to demand the rescission of the contract (if, during the term thereof, any great fortuitous event should occur which would prevent the operation of the estate under the ordinary conditions now existing) ; and also by the agreement that the lessor or his heirs should pay the credit which was the main ground for the execution of the instrument of lease, the lessor, however, assuming the obligation to make the advances necessary for operation until such payment had been made and a profit equal to that obtained during the preceding year.

"3. If the terms of a contract are clear and leave no room for doubt as to the intention of the contracting parties, the literal meaning of the clauses shall be followed and they shall be construed in

connection with each other, doubtful clauses being given the meaning which a deduction of all of them taken together may give. What has been stated permits of the deduction above made that the constitution of a lease shows the evident intention of the contracting parties and such intention must prevail in all contracts.

"4. In the contract the term is definite and the price fixed, the fifth clause fixing the former at ten years, and the second, third and fourth clauses fix the price, which is to consist during the first year of the sum of 28,182 *pesos* as the principal and interest on the mortgage debt payable in 1903; a similar sum more or less to be paid during subsequent years until the entire sum of 214,110 *pesos,* which constituted the mortgage debt on the estate leased, had been settled, the last instalment being payable in 1911. In addition to these instalments, the lease price included a payment to the lessor or his heirs, during the entire term of the contract, of 25 cents on every quintal of second grade sugar, 10 cents on every quintal of molasses, 50 per cent of the net receipts from the rum distilled, and one-half the annual net profits on the cattle which the lessor left on the estate; all of which amounts show the existence of a certain price.

"5. The duration of the term of the lease is not affected by the provisions of, and the stipulations contained in, the fifth clause of the contract, to the effect that if it should not be possible to pay the mortgage debt within the ten years owing to causes which could not be determined at the time of the execution of the contract, but which might arise without any fault on the part of the lessee company, the term would be extended for the time necessary, if the creditors should consent to the extension, and a period fixed for the payment of the entire amount due, provided, also, that the lessee accepted the extension; because such a stipulation is natural, as it cannot prejudice the lessor or his heirs in any manner, since they can pay the sum remaining unpaid at the end of the ten years referred to, or at any other time that they may desire to terminate the contract, in accordance with the provisions of the fourteenth clause.

"6. Bad crops owing to droughts, low price of sugar, small production from the sugar-cane, disease of the plants, and many other causes might render it impossible to settle the mortgage debt in question in ten years, were some of the grounds which the contracting parties took into consideration, according to the first clause, in ·
ing to the extension; but this does not permit the assertion that the term of the contract is indefinite, because the extensions do not avoid the term fixed, but are only the establishment of the right of the

parties to avail themselves thereof if proper and if in furtherance of their interests, as has been stated and as is provided in the fifth clause, and its concordant, the fourteenth; and, consequently, such extensions would have to be made the subject of a new agreement upon the expiration of the ten years fixed as the term of the lease.

"7. Furthermore, with regard to the certainty of the price and the duration of the term, the failure to fix the term of duration is not a ground for the annulment of a lease, as is shown by section 1480 and 1484 (of the Civil Code), which fix the legal term in the absence of an agreement; and as to the certainty of the price, the failure to fix the term of duration or uncertain condition of the price is one thing, and the numerical expression thereof is another, as there may be a price certain in a contract, which is the case in the contract under consideration, although it cannot be expressed numerically and only by means of the proper liquidations, and may be subject to fluctuations according to the product of the sugar cane and the cattle, in accordance with the theory established in sections 1350 and 1351 of the Civil Code applicable to leases.

"8. When a person is about to enter into a contract with the agent of another person, and when public officials are called upon in any capacity to consider the validity and efficiency of contracts entered into by agents, the literal terms of the appointment are the first source to which recourse should be had for the determination of the limitations thereof, although it is licit and absolutely necessary that the evident intention of the principal be considered when the words of the istrument appear to be contrary thereto.

"9. The words of the power of attorney to the effect that 'it shall be exercised in the name of and on behalf of the principal in accordance with the instructions which he may communicate to him separately,' indicates that such instructions being a private matter between the principal and his agent, such instructions would be binding upon them only, and the effects of such limitation could have no importance with regard to a third person nor cause him any prejudice, according to the jurisprudence established in an unbroken line of decisions of the Supreme Court, and especially those of November 18, 1864, and July 20, 1894.

"10. With regard to the allegation made for the purpose of contesting the ratification of the contract of lease by George Finlay, that the latter was not acquainted with the terms of the contract and could not have ratified it by a letter addressed to his agent, inasmuch as the letter of ratification states that he could neither read nor write, and,

therefore, he could not have communicated written instructions to his agent, nor could he have read the contract after its execution in order to ratify it, such allegation is untenable, not only because the written instructions might have been given by the principal to his agent at a time when he was able to write and therefore also able to read the contract before becoming unable to read; but also because an inability to read and write does not imply an inability to have the in-instructions written by another and signed by the principal (as was the letter in which the inability to write is stated) and the contract read by another person and ratified by the principal, after having been informed of its contents.

"11. The contract made by the attorney in fact is binding on his principal, and one of the questions at issue in the proceedings thereon is whether the former did or did not exceed the powers granted him by the power of attorney, when the document does not show any limitation of powers; and, even on the contrary hypothesis, the principal becomes bound from the moment that it is clear and evident that that he was acquainted with the contract entered into by his attorney in fact and made it valid by availing himself of that portion thereof which was favorable to him.

"12. As the heading to the contract of lease sets forth that Rafael Ojeda appeared as one of the directors of the defendant company, which was established on May 23, 1901, before the notary who executed the contract, and gives the names and surnames of the partners composing it, among whom appears Ojeda, and that any one of the partners was authorized to sign the firm name, the eleventh clause, which so provides, being inserted, it is of little moment that Rafael Ojeda should have used his own name and surname and not the firm name, especially if we take into consideration the fact that the company made use of the instrument without making any objection thereto, but, on the contrary, maintaining its validity in these proceedings; nor is it of any importance that Ojeda should subsequently have signed the inventory of the estate leased with the name of the defendant company and not with his own.

"13. By the lease, according to the instrument, the lessor and the lessee bound themselves mutually, one of them giving and the other offering to give what the law requires in such contracts; and, as it is stated therein, in its second clause, that one of the considerations for the execution is the payment of the mortgage debt, amounting to 214,-110 *pesos*; and in the second statement contained in said instrument, that the contract is also prompted by the state of health of the lessor,

which is far from good, and which forces him to absent himself from the island and abandon the personal management of his business and of the estates leased, this statement being corroborated by the death of the lessor on December 24, 1902, two months after the execution of the contract, and by the testimony of the witnesses Saldaña and Crosas; it cannot be said, in view hereof and the weight of the evidence adduced, that there is and was no ground or consideration for the contract, and, with still less reason, that such consideration was illicit, fraudulent and false.

"14. If a consideration is not stated in a contract, its existence is presumed, and also that it is licit until the contrary is proved, and the testament made in 1896 does not show, nor can it show, any incompatibility with the lease, nor does the evidence taken as a whole show the existence of other considerations.

"15. There is no ground for the allegation that the only reason for the contract in question was a desire on the part of George I. Finlay to avoid the effects of the suit for divorce brought against him by his wife, because after a notice of such suit for divorce had been entered in the registry of property against the real property of George I. Finlay all the acts of the latter relating to such real property would have to be subject to the consequences of the judgment rendered in the divorce proceedings recorded; and, therefore, it cannot be presumed that the contract referred to was due to a purpose to avoid the effect of the liquidation of acquets and gains, which purpose could not have been attained at all by the execution of a contract with an illegal consideration or without any consideration whatsoever, while, on the other hand, the record of the suit could not have prevented the defendant from performing any act looking to the alienations of the property against which the notation had been made.

"16. Assuming that the contract question had a fraudulent consideration, in accordance with the principle which governs the subject of the annulment of contracts, as set forth in article 1269 of the Civil Code, the action for annulment could not have been brought by George I. Finlay, who would have given ground therefor by leasing under onerous conditions his 'Carmen' estate for the purpose of evading the effects of proceedings brought against him, nor could such action have been exercised by his heir and successor in right, whose title to the estate leased emanates exclusively from the conveyance thereof to her by the person responsible for the ground for annulment which she alleges in these proceedings.

"17. The statements contained in a testament, being a unilateral act, prejudice only the testator and his heirs, in accordance with the principles governing the probatory force of public documents laid down in article 1186 of the Civil Code; consequently it is not proper to invoke the statements made by George I. Finlay in his will made on April 11, 1896, for the purpose of refuting those made years later in a contract embodied in a public instrument.

"18. The parties whose demands are in all things denied should be adjudged to pay the costs.

"We adjudge that we should dismiss, and we hereby do dismiss, the complaint brought by Josephine Finlay de Fabián against Finlay Brothers and Waymouth Trading Company, and therefore render judgment in favor of the defendant company, with the costs against the plaintiff. So pronounced, ordered and signed by this, our judgment.—Juan Morera Martínez, José Tous Soto. Judge Frank H. Richmond concurred."

### OPINION OF JUDGE FRANK H. RICHMOND.

"Without having examined the record as carefully as it would have been necessary to do if the delivery of the opinion had fallen to the undersigned, I concur in the dismissal of the complaint. The complaint has presented itself to my consideration under two distinct bases within the same main issue. Was the lease of the 'Carmen' estate executed by John Finlay as the attorney in fact of his brother George, its owner, to the company of which both brothers, John and George, were stockholders, so advantageous to the agent and prejudicial to the interests of his principal as those of the heirs of the latter, who would have substituted him within a short time after the said execution, that it could be qualified as fraudulent, in the judicial sense of the word, with respect to such heirs, and did it require an express ratification by said principal in order to make it legally valid, which does not appear from the record to have been made? I do not believe that, in view of a juridical fraud clearly established, the expression of general satisfaction as to the arrangement effected, as appears from the letters of George Crosas y Cuevillas, now deceased, lacking as there is inherent proof that the deceased had a full knowledge of the details of said contract of lease, is sufficient to establish an express ratification. Although it is true that this phase of the case has only been touched on lightly by counsel for the plaintiff, in my mind it is the only phase upon which the success of such complaint on its merits could depend, and I do not find any act of

such a nature in the contract of lease executed by the agent which would give the latter so great an advantage against the interests of his absent principal as to justify the conclusion that the lease contract was as legal as it was literally fraudulent. The more minutely one examines the contract the greater grows the conviction that, far from being in conflict with the testament made years before, and a revocation thereof to a certain extent, it is a carefully considered plan to guarantee the exccution of the plans of the testator as set forth in his testament.

"An immense sugar plantation, with the necessary machinery, very difficult to manage and operate, is willed to three heirs; the testator provides that the estate shall first be freed from all encumbrances; that said estate is not to be encumbered anew, and that it shall remain for the absolute enjoyment and benefit of said heirs; to this end the absolute enjoyment of the property is suspended until the mortgage shall have been paid and the income which they are to enjoy in the meantime is fixed at 300 *pesos* per month each. Provision is also made against an unexpected alienation of the estate (although this may be ineffective, owing to the absence of all the technical requirements of a testamentary trust) by a clause to the effect that if it should be necessary to sell the property the proceeds from such sale shall be invested in British bonds or deposited in the Bank of England. In view of the palpable intention of said testament, I cannot find that the contract of lease, executed by the agent, could produce any other result than to further the fulfillment and execution of the will of the testator. The pleadings and the evidence do not leave in my mind the slightest suspicion that the lease constituted an act which would have as a consequence the personal enrichment of the agent to the prejudice of the heirs.

"George Finlay held 400 shares in the lessee company, of which shares 261 passed upon his death to two of his heirs and 55 to a legatee who is on friendly terms with them, and the remainder (whether 84 or 100 does not appear very clearly from the record) are held in co-ownership by the executors or trustees for purposes connected with the discharge of their trust. The plaintiff voluntarily accepted a distribution of the property of the testator under which none of said shares came into her possession. The husband of one of the heirs is a stockholder in his own name, but the record does not show in what amount, nor does it show the extent of the interest or ownership of John Finlay in said company. Nevertheless, the facts which I am able to deduce from the record serve to convince me that if the lease

were beneficial to John Finlay as a stockholder in the lessee company, it is also at the same time, by the same instrument and in a greater proportion, advantageous and lucrative to those of the heirs who voluntarily did not renounce their share of the profits as stockholders. The plaintiff pleads that in 1904 the profit of the lessee company, after the payment of the annual sum and the interest on the mortgage, would be 407,086 *pesos;* that in the tenth year of such term the profit would be, without the payment of any amount on the mortgage, 70,000 *pesos;* the balance sheet ·of the company for the year 1902 shows a profit of 529,000.78 *pesos* on all transactions consummated during the year in connection with the 'Carmen' estate. In that year 57,520 quintals of sugar were produced, valued at 184,541 *pesos,* instead of 6,900 quintals, with a value of 228,900 *pesos,* as the plaintiff alleges. The heirs receive in equal shares the profits from the cattle of the lessee·company, and this element may be rejected in seeking for an indication of the existence of any fraud. I am not certain as to whether these balance sheets include any interest or annual payment on the mortgage, but it certainly cannot include a sum greater than 15,000 *pesos* paid to the heirs in accordance with the provisions of the clauses of the lease contract, at the rate of 25 cents per quintal on the sugar produced and 10 cents on each gallon of rum. If 27,000 *pesos* more is to be paid, by reason of the mortgage, from the profits, the net profit of the lessee company disappears, and upon analyzing the balance sheet I cannot believe that the production of sugar will give a profit much in excess of the sum of 40,000*pesos.* There is no other point in the evidence presented by the plaintiff supporting this phase of the case, excepting the expert evidence as to the capacity of the 'Carmen' estate to produce sugar, and this evidence does not modify what I believe to be a reasonable conclusion of the facts as I have found them, without considering the risk and the difficulties to which said industry is subject, the necessity of using a capital of 100,000 *pesos* per annum to conduct this business, which sum must be furnished by the lessee company without any help of any kind on the part of the plaintiff; and, principally in view of the high degree of skill necessary for the administrative success of a sugar plantation, and also the scarcity of competent managers, a lease cannot be considered unreasonable when it results in giving the holder of one-quarter of the stock of the lessee company for his work in the general administration of the estate 100,000 *pesos* per annum on his part of the profits, instead of a profit of 2,500 *pesos,* which appears more probable than what appears from the record. Consequently, the con-

clusion that the agent executed a contract of lease to enrich himself personally, to the prejudice of the interests of the heirs, cannot find any basis in the evidence presented.

"2. Is the renewal clause of the lease contract so drawn that it places said property beyond the control of the heirs for an indefinite period and does not leave the latter any option as to the term of such lease? The lease contract also lacks something with regard to the form in which it is drafted, as it contains no clause to provide against noncompliance therewith by failure to pay the sum which the owners receive in lieu of rent. If this were the effect and construction of the fourteenth clause of the lease contract, the advantage which the agent would obtain by leasing the property to a corporation of which he is a shareholder, indefinitely postponing the entrance of the heirs upon the full enjoyment of their respective rights as such, would render such lease of no value, owing to constructive fraud, unless the principal should have ratified it with the formalities and solemnity required and present in the testament by which the principal transferred the property to his daughters, subject solely to the payment of the mortgage debt. In these two particulars this contract of lease has not been considered with that care which characterizes the work of the notaries of Porto Rico, but it is hard to conceive that the lessee company could be maintained in the possession of the property after a voluntary failure on its part to deliver the sums stipulated, nor that any extension whatsoever of the term of the lease upon the termination of this contract could be effective without the heirs consenting thereto. It cannot be imagined that such a strict adherence to the letter of the contract of lease or such a perversion of justice in the construction and application of the Civil Code and of the article which provides for the rescission of a contract for failure to comply with the stipulations thereof, entailing a long delay in the heirs taking possession of what belongs to them, could be found in the courts of Porto Rico. I have presented my opinion in this manner because I am not certain that the case as developed by the arguments of the complainant, as heard and as decided, rests upon the merits of the questions which are to be considered in the matter, and there has not been time sufficient to do the work of selecting and coordinating one article of the Civil Code with another necessary to permit of the consideration expressed by me being set forth in the form mentioned in the Civil Code and of the proper citations of the articles thereof which justify the various phases of the question which I sustain, and which may be briefly stated as follows: 1. General authority contained in a

power of attorney does not authorize an agent to enrich himself at the cost of his principal. 2. When a contract, executed by an agent in the name of his principal, contains a possibility of the former enriching himself at the cost of the latter, there is necessarily required, in order to make it valid, an express and explicit authorization to make such contract or a confirmation thereof, which is in itself equivalent to an express and explicit ratification, and any party executing a contract of this character through an agent does so at his own risk. 3. A contract thus made, which has in its scope and effect the enrichment of the agent, and is consequently constructively fraudulent, may be rescinded in the absence of express authority or express ratification, because the original authority to make the contract does not exist, and, being null, it may be set aside upon the demand of the principal or those who remain in his place. An inquisitive spirit with respect to whether such a contract was the main issue of the proceedings has led me to study the case, and as I fail to find such an element present, I concur in the judgment and in the reasoning on which it is based.— Frank H. Richmond.''

Counsel for the plaintiff appealed from this judgment, the appeal being allowed, and upon transmission of the record to this court the parties entered an appearance in due time.

Counsel for the appellant in his brief and oral argument at the hearing reproduced the same reasons which had been alleged in her complaint, which have been set forth and discussed in the judgment which is the subject of this appeal.

Counsel for the respondent likewise reiterated in his brief and oral argument the legal grounds upon which his answer was based, which are also set forth and discussed in the judgment referred to.

*Mr. Eduardo Acuña,* for appellant.

*Messrs. Díaz and Texidor,* for respondents.

MR. JUSTICE FIGUERAS, after stating the foregoing facts, delivered the opinion of the court.

The findings of fact and conclusions of law contained in the judgment appealed from are accepted, with the exception of the sixteenth conclusion of law, the foregoing being accepted in lieu thereof:

16. The real point of importance in this litigation upon which the demand for annulment rests principally is the supposition that the contract of lease was simulated by George I. Finlay, for the purpose of avoiding the effects upon the conjugal property which might result from the suit for divorce brought by his wife Emilia Van Rhyn; but there is no evidence whatsoever which in a direct manner leads to the conviction that the contract was prompted by such a motive, and it is not possible to advance mere conjectures against the public instrument of October 24, 1906, executed with all the formalities and conditions required by the law, the falsity or nullity of which has not been established, and which contains the legitimate consideration of said contract of lease which was ratified by the contracting party George I. Finlay, according to letters addressed by him to Hilario Cuevillas and George Waymouth on November 7, 1902, for which reason it is not necessary to consider whether the heir and appellant Josephine Finlay de Fabián can or cannot prosecute an action for the annulment of said contract.

19. The costs of the appeal should be taxed against the party appellant.

In view of the provisions cited in the judgment appealed from, we adjudge that we should affirm and we hereby do affirm the judgment rendered by the District Court of San Juan on June 2, 1904, dismissing with costs the complaint filed by Josephine Finlay de Fabián against Finlay Brothers and Waymouth Trading Company, and we tax the costs of the appeal against the party appellant. This opinion will be communicated to the court and a copy hereof will be transmitted to the same for the proper purposes.

Chief Justice Quiñones and Justices Hernández and MacLeary concurred.

Mr. Justice Wolf did not sit with the court at the hearing of this case.